Opinion of
the Court.
Charles Webb having departed this life, administration of the estate was, in 1806, granted to his widow, Mary Webb, and his brother, Isaac Webb.
The personal estate of the intestate, was sold by the administrators, and the slaves hired out for several years.
Commissioners were appointed in 1808, by the county court, to adjust and settle the accounts of the administrators. The commissioners accordingly adjusted and settled the accounts, and their report was admitted to record.
Commissioners were also appointed to assign the widow her dower in the lands and slaves, and ascertain her distributive share of the personal estate. The commissioners performed the trust assigned them, and made their report to the court.
There appear to have been commissioners appointed, also, to ascertain and make partition of the estate, between the heirs of the intestate; and by their report of 1809, assigned to Fanny, the wife of William Conn, certain slaves by names, and fixed on the amount then supposed to be coming to her, out of the hire of the slaves and the personal estate. The amount reported to be due Fanny for the hire of the slaves and the personal estate, was received by her husband, together with the slaves assigned her.
Some time subsequent to the appointment of commissioners in 1808, and after they had acted in adjusting *476 and settling the accounts of the administration, a mistake in their report seems to have been discovered; and commissioners were again, in 1819, appointed to revise and correct any mistake which had occurred, and to make report to the court, &c.
It seems, if he uses it himself and receives the profits, he will be chargeable with interest.
Where an administrator had hired out a slave belonging to the estate, & taken a bond with security, and afterwards he, by agreement with the hirer, took that slave back, & substituted one of his own, at a higher price, the bond was altered by their agreement,without that of the security, to fit this new bargain; the hirer became insolvent, & the security was discharged, on account of the alteration in the bond: Held, that the administrator should account to the devisees for the hire.
Those commissioners accordingly convened, and entered on the duties assigned them; but owing to some contest between Isaac Webb, one of the administrators, and William Conn, who managed the business on the part of the heirs, as to credits claimed by the administrators and charges against them for interest, the administrator, Isaac Webb, refused to abide by the settlement about to be made by the commissioners, and acting under the advice of counsel, applied to the court and caused the order appointing commissioners, to be set aside.
Three of the children of the intestate, John, Nancy and Winney, appear to have been all this time infants, under the age of twenty-one, and William Conn was appointed their guardian; but when he was appointed, does not appear in the record.
After this, and in 1819, William Conn and Fanny, his wife, Charles Webb and John Webb, Nancy Webb and Winney Webb, by their guardian and next friend, William Conn, exhibited this bill in equity to compel the administrators to account for the personal estate and the hire of slaves, and for distribution, &c.
In the progress of this cause, the circuit court made an interlocutory decree, appointing commissioners to adjust and settle the accounts of the administration, and supposing that the administrators were liable for interest, instructed the commissioners in taking the account, to allow interest from the date of the settlement in 1808, on the amount which the administrators might be found to have been in arrear, and to allow interest on such sums as the administrators thereafter became chargeable with, from the time those sums were or might have been received by them.
In conformity to the interlocutory decree, the commissioners reported the amount of interest as well as principal, which they ascertained to be due each of the distributees. To William Conn, including principal and interest, they reported the administrators to be owing, £5 5s 4d 1-2; to Charles Webb, £160 17s 3d; to John Webb, £ 160 17s 3d 3-4; to Nancy Webb, £390 10s 6d 1-2; to Winney, she having intermarried wit *477 h—Innis, £39 10s 6d 1-2. They, also, reported that there remained coming to Mary Webb, the widow, including principal and interest, £69 11s.
On this report the court pronounced a final decree, ordering the administrator, Isaac Webb, (it appearing that he alone received the estate and hired out the slaves,) to pay each of the distributees the amount as reported by the commissioners, together with interest on the same, from the 29th of February 1819, until paid. The court also decreed Isaac Webb to pay the widow, Mary Webb, the amount reported in her favor with like interest. From that decree Isaac Webb appealed.
The decree in favor of the widow, is obviously irregular. She appears to have been one of the administrators, and a co-defendant with Isaac Webb, and her answer has not even suggested a claim against her co-defendant, Isaac, or prayed any decree in her favor against him; and without some such suggestion or prayer, it would be in violation of the well settled rules in chancery practice, to make a decree in her favor.
The decree in favor of the children of the intestate, Charles Webb, is not, however, subject to the same objection. They were complainants seeking relief in the court below, and are entitled to such a decree, as, from the evidence and exhibits in the cause, they have shown themselves entitled to.
The principal objection taken to the decree in favor of those complainants, and that to which the attention of this court is particularly drawn by the assignment of errors, questions the propriety of compelling the administrator to pay interest on the several sums received by him, in his fiduciary character, from the different periods fixed on by the decree.
That an administrator may, under peculiar circumstances, be compelled to account for interest, will not be contested; but that he is not, as a legal consequence, liable for interest on all sums which he has or might have received, from the time they might have been received by him, seems to result so naturally from the duties and responsibilities of his office, it is presumed that none will be disposed for a moment to question it.
The law has assigned to the kindred of deceased persons, the surplus of their slaves and personal estate, after the payment of their debts, &c. and has imposed upon administrators, the burthen of paying the debts *478 and distributing the surplus among those entitled to distribution. The administrator, by paying over the estate to the distributees, cannot extricate himself from his responsibility to the creditors of the intestate. Whether he knows or not of the existence of debts at the time of paying over the estate to the distributees, he remains liable to those having debts against the estate.
It is proper, therefore, that an administrator should be secured by the distributees against the creditors of the intestate, before he is compellable to pay ever the estate in his hands to them; and to that end, the legislature of the country have expressly enacted, that no distribution shall be made of the intestate’s estate, until nine months after his death, nor shall an administrator be compelled to make distribution at any time, until bond and security be given by the persons entitled to distribution, to refund due proportions of any debts or demands, which may afterwards appear against the estate, and the costs attending the recovery of such debts—1 Litt. 623, sec. 50; [1 Dig. 532.]
Now if, as is declared in the section we have cited, the administrator is not compellable to pay over the estate to the distributees, until bond and security are given by them, it follows as a necessary consequence, that the failure to pay before the bond and security are tendered, cannot subject the administrator to the charge of interest; for the giving of bond and security, are acts to be performed by the distributees, and as that must be done before they can legally demand distribution of the estate, their failure to give the bond ought not and cannot, impose any additional responsibility on the administrator.
But were the mere failure of the administrator to pay over the estate to the distributees before they execute such bond, as we have supposed necessary, sufficient, in ordinary cases, to subject the administrator to the charge of interest; still, we should be of opinion, that the present case would form an exception, as respects the infant complainants. After a guardian was appointed for them by the county court, their case was not distinguishable from the adult complainants; but before the appointment of a guardian, there was no person to whom their part of the estate could have been legally paid by the administrator, and the law cannot be *479 admitted to be so inconsistent as to impose on the administrator the burthen of paying interest on the money held in his fiduciary character, without affording him the means of extricating himself by paying it.
But notwithstanding the mere failure to pay the distributees before the execution of a bond of indemnity by them, may not be sufficient to charge the administrator with interest, he may, nevertheless, under peculiar circumstances, become liable for interest before such bond is tendered. By the receipt of the estate by an administrator, he is considered in equity as holding it in trust for the distributees; and if, instead of holding it exclusively for the purposes it was received, he should apply it to his own use and make profit of it, equity will hold him accountable, not only for the estate, but also for the interest.
An opinion seems to have been anciently entertained, that as an executor was not bound to lend money belonging to the estate of the testator, he was entitled to any gain which he might make by lending it. But it is now well settled, and certainly more consonant to reason than the opinion which at first prevailed, that an executor or trustee is chargeable in equity with interest, whenever he appears to have made interest—2 Fonb. 184, and the authorities there cited.
Having premised these general remarks on the subject of interest, we will proceed to enquire, whether, from the circumstances of this case, the administrator is chargeable with interest, and if so, the extent of his liability.
If the administrator is liable, it is evident that his liability must have arisen in consequence of his having made profit out of the estate, and not because of his failure to pay the estate to the distributees; for we have already seen, that the mere failure to pay before bond and security was tendered by the distributees, does not subject the administrator to the payment of interest; and there is not only a failure to prove the tender of such bond, but there is not even a suggestion in the bill that such a tender was ever made by any of the distributees.
It cannot be doubted from the evidence, but what the estate might have been loaned by the administrator at interest; and it is contended in argument, that as he might have made profit, even if he failed to do so, he ought to account for interest. But it should be re *480 collected, that an administrator is under no obligations to lend the estate in his hands, and for a failure to do so, cannot be chargeable with the profit which might have been possibly made.
But it is also contended, that from the answer of the administrator, as well as from the evidence in the cause, the fact of his having loaned out the estate, is sufficiently established to charge him with interest.
It is obvious, however, that nothing unfavorable to the administrator can be inferred from the answer. The answer, it is true, contains no denial of the administrator’s having loaned the estate; but were the allegations of the bill, in consequence of the failure of the administrator to deny them, admitted to be true, they are not of the description from which the fact of the estate’s having been loaned by the administrator, can be presumed ; for the bill barely alleges, that the administrator has either used the moneys received on the account of the estate, or has loaned them out, or if he has not done so, he could have loaned them with safety and convenience; and taken in the sense in which these observations are employed in the bill, they only prove, that the money was either used or loaned, or might have been loaned by the administrator.
With respect to the evidence, it should be remarked, that the only deposition calculated to charge the administrator with interest for lending money, is that of Matthew Scott. Another witness has spoken of the administrator’s having loaned about two hundred dollars of the estate; but as the obligation taken for the money was shortly thereafter transferred to one of the distributees, it would be improper in this case, again to charge the administrator with the interest.
Scott, however, proves that in 1814 or 1815, the administrator loaned about $1000 of the estate to Trotter, and it is inferrable from his deposition, that the money so loaned, has been ever since continued out at interest.
For the interest on the $1000, therefore, the administrator should be compelled to account, from the time it was first loaned by him. There is some difficulty in fixing on the time when the $1000 was first loaned; but the witness speaks of its having been loaned in 1814 or 1815, and we are inclined to the opinion, that interest should commence running from the first of the year 1815.
*481 On the residue of the amount ascertained by the commissioners to be due from the administrator, we are of opinion, that interest should not be allowed.
It may be proper to notice an exception taken to the report of the commissioners in the court below, by the counsel of the administrator. The exception to which we allude, questions the decision of the commissioners in taking the account, in refusing to allow the administrator a credit for the amount of the hire of one of the negroes for one year. It appears that the administrator on hiring the negro, received bond with security for the amount, and by an arrangement afterwards made, between the person hiring and the administrator, the negro belonging to the estate was returned, and one of his own negroes delivered to the person hiring, with an understanding that a larger sum should be paid than was at first agreed on. Accordingly, the obligation first given was changed to meet the subsequent agreement of the parties; but without the assent of the security. The bond so changed, was afterwards put in suit; but the principal proved insolvent and the security was discharged in consequence of the alteration. It was contended that the loss ought not to be sustained by the administrator; but as the loss was occasioned by the illegal act of the administrator, we apprehend that the court decided correctly in overruling the exception.
Decree reversed.